* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rideout and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence. Accordingly, the Full Commission rejects the findings and conclusions of law of the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged injury, giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act. *Page 2 
2. At such time, an employment relationship existed between plaintiff and defendant. The carrier liable on the risk is correctly named above.
3. The employee's average weekly wage will be determined from an Industrial Commission Form 22 wage chart to be provided by defendants with supporting wage information subject to review upon receipt.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner plaintiff was a 49 year-old high school graduate with an Associates Degree in Business from Wilson County Technical College.
2. Plaintiff has a vocational background, working primarily in retail. Plaintiff previously worked for K-Mart, Aegis Communication, and Wilson County Schools.
3. Plaintiff began her employment with defendant as a set up person in 1993 and then she moved to the deli. Plaintiff left Wal-Mart after one year. She was rehired around November of 2003 as a salesperson for the jewelry department. Plaintiff worked in this department for approximately one year before being moved to the front-end cash registers.
4. Plaintiff alleges she developed an occupational disease in her right hand, arm, and shoulder on or about May 4, 2005 through repetitive heavy lifting while working as a frontline cashier for defendant.
5. Plaintiff testified to first noting problems with her right hand and arm in February or March 2005. However, she told her family physician, Dr. Dalwai, that her symptoms began in *Page 3 
April 2005, and she told Dr. Dalsimer, an orthopedist, that her symptoms began in December 2004 when she lifted a loaf of bread.
6. Defendant received notice in May 2005 that plaintiff was being placed on light-duty restrictions for her right arm but did not receive any information on the underlying injury for which the restrictions were assigned. Defendant accommodated the restrictions by assigning plaintiff to work as a greeter and to take customer applications at the store's credit card table.
7. In October 2005, plaintiff then began working as a sales associate in defendant's jewelry department. The regular duties of this position were within the restrictions assigned by her medical providers.
8. Plaintiff acknowledged that while she worked light duty, her pay rate remained equal to what she had earned as a cashier.
9. At the hearing before the deputy commissioner, plaintiff stated she continued to have pain in her right arm and hand while working as a jewelry associate and started having similar problems with her left hand and arm more recently. At the same time, she confirmed that she last worked as a frontline cashier in late April or early May 2005, which was approximately 11 months prior to the hearing before the deputy commissioner.
10. On July 6, 2005, plaintiff was involved in a motor vehicle accident. This resulted in stiffness and soreness in her back and neck and caused her to have trouble bending and standing for prolonged periods of time. When her symptoms did not improve, she returned to the emergency department at Wilson Medical Center and had x-rays taken. She received pain medication and stayed out of work for a couple of days. Plaintiff further indicated that the motor vehicle accident aggravated her right arm and shoulder pain. *Page 4 
11. Plaintiff was present at the store on February 23, 2006 when an ergonomic study of the cashier position was performed by Ergonomist William McClure. She was able to observe Mr. McClure and provide her input about the cashier tasks.
12. Defendant first received notice of this workers' compensation claim and plaintiff's contention of a work-related injury to her right arm on June 3, 2005. The report came about when Chris Bridgers, the co-manager at the Wilson store, asked plaintiff when she would be released from light duty. Her initial report was that she lifted a loaf of bread and had an onset of pain in her arm.
13. Mr. Bridgers confirmed that plaintiff returned to regular duty working as a jewelry department associate in October 2005. This position involved customer service at the register in that department. The job generally did not require any lifting over 5 pounds, and there was no repetitive lifting.
14. Mr. Bridgers disagreed with plaintiff's contention that the frontline cashier job involved repetitive heavy lifting. He stated the majority of the items weigh under 10 pounds. Heavy merchandise also has peel-off labels containing the barcode, and the cashiers have access to handheld scanners as well. Mr. Bridgers explained the weight range for the majority of products coming down the cashier line was no more than three to five pounds, which he would consider a "moderately heavy object."
15. According to Mr. Bridgers, plaintiff worked approximately 70% of the time at the store's belted cashier lines and 30% at the express lines.
16. Following plaintiff's July 2005 motor vehicle accident, Mr. Bridgers was aware that plaintiff had a sore neck and stiff back and that this limited her work for a period of time. *Page 5 
17. Pamela Brake, the Risk Control Manager for the Wilson store, corroborated Mr. Bridgers' testimony. She further testified that she took witness statements from co-workers who had no recollection of any injury reports by plaintiff.
18. With respect to the jewelry associate position to which plaintiff switched in October 2005, Ms. Brake explained that this position did not involve any repetitive heavy lifting. It basically consisted of taking out and showing the jewelry.
19. Prior to the hearing, defendants retained the services of Mr. McClure to perform an ergonomic evaluation of the cashier position performed by plaintiff during her employment with defendant. Mr. McClure is certified in the field of ergonomics and is the co-owner of Hand Rehabilitation Specialists in Greensboro, North Carolina, where he directs an industrial rehabilitation program. Mr. McClure testified as an expert in ergonomics.
20. Mr. McClure performed an ergonomic analysis of plaintiff's cashier position on February 23, 2006 and in conjunction with this analysis prepared a five-page written report, which was entered into evidence by the parties.
21. Prior to the ergonomic assessment, Mr. McClure reviewed plaintiff's medical records related to her right arm claim. On the date of the ergonomic study, he then met with Pamela Brake, the Assistant Store Manager Gail Davis, and plaintiff. In discussing the cashier position with them, Mr. McClure was able to obtain information about plaintiff's work history and the amount of time she spent working as a cashier.
22. Mr. McClure studied the cashier position for three and a half hours, observing seven cashiers and approximately 3,000 items and recording data from the two different types of cashier stations at the store. The two types of work stations used by frontline cashiers at the Wal-Mart store where plaintiff worked are an express *Page 6 
register cashier station and a belted register cashier station. The difference between the two is that the express cashier station does not have a conveyor belt.
23. The Wilson Wal-Mart Supercenter where plaintiff worked had twenty work stations with a conveyor belt recessed in the countertop, also referred to as belted lines, and ten work stations that did not. Those ten work stations were the express cash registers.
24. The weights of the merchandise scanned by a frontline cashier on a frequent basis primarily ranged from a negligible amount, i.e. less than one pound, to up to ten pounds. Heavier items coming across the registers were generally handled by hand scanners, which do not require the cashier to pick up and handle any heavy item. Bulk items also have peel-off bar codes on them for the cashier to remove and scan. Such peel-off labels are found on merchandise like TV sets, allowing the cashier to not have to handle the merchandise at all.
25. The heaviest item Mr. McClure saw a cashier physically handle was either a case of water or a case of soda. This occurred only on an occasional basis.
26. With respect to ergonomic stressors for the belted cashier line, Mr. McClure determined that the cashier position did not require shoulder postures that exceeded appropriate movement parameters. The work thus remained within normal shoulder posture limits. Based on his objective measurements and use of an ergonomic checklist, Mr. McClure concluded to a reasonable degree of ergonomic certainty that there is no increased risk for the development of musculoskeletal or cumulative trauma disorder in the upper extremity for a cashier working on the belted line compared to the general public.
27. With respect to the express line, Mr. McClure stated that this position at times exceeded appropriate joint movement parameters and placed the cashier at a low to moderate level of risk for developing musculoskeletal or cumulative trauma disorder in the upper *Page 7 
extremity. However, plaintiff only worked thirty percent (30%) of the time at the express register. Seventy percent (70%) of plaintiff's time was spent at the belted line.
28. As Mr. McClure's findings show that the belted register, where plaintiff spent the majority of her time working, did not pose any increased risk to the development of musculoskeletal or cumulative trauma disorder in the upper extremity compared to the general public and the express line only posed a low risk, the Full Commission finds that plaintiff's frontline cashier work as a whole did not place her at an increased risk for the development of musculoskeletal or cumulative trauma disorder in her right arm and shoulder as compared to the general public.
29. Mr. McClure also assessed work exposure to other body parts besides the arm and shoulder. Based on his findings, he expressed an opinion to a reasonable degree of ergonomic certainty, and the Full Commission hereby finds as fact, that plaintiff's work as a cashier created no increased risk for injury to her hand, wrist, or neck as compared to the general public.
30. Mr. McClure further testified that in the context of occupational diseases the conditions of tendonitis, bursitis, and epicondylitis of the right shoulder and elbow are most often seen in types of jobs which occur in textile mills and in the furniture manufacturing industry. People with these types of injuries are most often upholsterers or frame builders. Those types of jobs are different from a cashier job in that they involve the performance of forceful exertion by the hands and placement of exertional forces on the upper extremity through pushing and pulling-type activities. For instance, those employees would be reaching high up or be working in production having to produce up to 10,000 parts per day with similar motions and force involved in the actual assembly task. *Page 8 
31. Dr. Krabill, whose specialty is in the field of internal medicine, first treated plaintiff for complaints related to this workers' compensation claim on June 6, 2005. Plaintiff provided him with a history of progressive onset of right hand, elbow and shoulder pain over the last two or three months that was gradually worsening. Plaintiff denied any neck pain although she had reported neck pain to her family physician Dr. Dalwai just a few weeks earlier.
32. Following an examination, Dr. Krabill formed an impression of lateral epicondylitis, which is more commonly known as a tennis elbow, and deltoid bursitis of the right shoulder. Dr. Krabill assigned light-duty work restrictions, which defendant accommodated.
33. The second and last time Dr. Krabill saw plaintiff was on June 24, 2005. He performed a physical examination that day and commented on defendants' denial of the workers' compensation claim.
34. In explaining his causation opinion contained in his June 24, 2005 medical record, Dr. Krabill stated that "by her description, . . . the repetitive motion activities seemed related temporally to the clinical problems that she was having." Yet, when asked whether he had an opinion to a reasonable degree of medical certainty whether plaintiff's right hand, arm, and shoulder condition were causally related to her cashier work, Dr. Krabill responded that "[i]t's hard to be exact." He explained that repetitive motion activities which would require moderately heavy lifting "could cause problems in the arms"; but he could not positively say that they did in this case.
35. Dr. Krabill also pointed out that in "a lot of industries and other situations . . . the repetitive motions are a little more continuous in pattern" and there are more "variations in the motions that are performed by a cashier," implying that a cashier position would be less likely to cause a repetitive motion injury. He concluded by stating that he could not "give . . . an absolute *Page 9 
answer" and could only say that the work activity "might" have "contribute[d] to the discomfort that she ha[d] in her shoulder and elbow."
36. Dr. Krabill also testified that people with inflammatory arthritis, like rheumatoid arthritis, will be more likely to develop bursitis and tendonitis issues, and plaintiff's MRI results confirmed the existence of arthritis in her neck.
37. Dr. Krabill testified that it was certainly possible that any pain symptoms plaintiff was reporting in the right upper extremity after her motor vehicle accident in July 2005 were due to an independent injury from the motor vehicle accident instead of the cashier work. Dr. Krabill explained that the neck can cause pain in the upper extremities.
38. Dr. Krabill acknowledged that he relies to a large extent on the patient's description of how an injury occurred in reaching his conclusion about what may have caused a particular injury. He stated that he did so in plaintiff's case. However, Dr. Krabill could not actually recall what, if anything, plaintiff told him about the frontline cashier job.
39. Dr. Krabill had assumed on June 24, 2005 that plaintiff's work involved lifting moderately heavy objects. When asked what Dr. Krabill considered to be a moderately heavy object, he defined it as a 50-pound bag such as dog food, heavy cat litter, water cases, or soft drink containers. Thus, what Dr. Krabill identified as a moderately heavy object, which was also the basis for his causation opinion in his June 24, 2005 medical report, was not part of the routine job duties identified by Mr. McClure during his ergonomic study, as such items only occasionally came across the check-out line and generally did not have to be physically handled by the cashiers due to hand-held scanners and peel-off labels.
40. Dr. Krabill was not aware of any of the medical findings and diagnoses made by plaintiff's other medical providers after June 24, 2005. Dr. Krabill did not have the benefit of *Page 10 
any independent data on the cashier position at the Wilson Wal-Mart store that would have given him insight into the ergonomic risk factors of plaintiff's cashier work. He testified that such data would certainly have been helpful in determining the impact of plaintiff's job duties on the upper extremity and the development of her bursitis and epicondylitis.
41. After reviewing Mr. McClure's ergonomic study, Dr. Krabill stated the study would be a helpful tool in assessing the occupational risk factors and exposure associated with the cashier duties performed by plaintiff. Based on the study, Dr. Krabill agreed, and the Full Commission finds, that a documented ergonomically low-risk situation would be less likely to be the cause of the musculoskeletal-type pains that plaintiff was having.
42. Plaintiff has not worked as a frontline cashier since late April or early May 2005. Both Dr. Krabill and Dr. Dalwai testified they would expect a patient to be improving after removal from a work environment causing a repetitive motion-type injury if it was in fact the work environment that caused the injury. Accordingly, in plaintiff's case, since it had been a whole year since removal from her work as a cashier, both doctors would have expected an improvement in plaintiff's condition if the cashier job had been the cause of her symptoms.
43. The Full Commission therefore finds that plaintiff's ongoing reports and treatment for her right hand, arm, and shoulder over a year after having last worked as a frontline cashier are inconsistent with a repetitive-motion injury from her employment with defendant as the cause of her symptoms.
44. Taking into consideration the ergonomic findings and the fact that plaintiff has continued to report pain even though she has not worked in the cashier position for approximately a year, it was hard for Dr. Krabill to say to any degree of medical certainty whether plaintiff's work more likely than not caused her right upper extremity injuries. *Page 11 
Furthermore, since Dr. Krabill had not treated plaintiff since June 2005, he testified he "certainly can't say to a degree of medical certainty" that her current symptoms are related to her work as a cashier.
45. The parties also deposed Dr. Fatima Dalwai, who testified as an expert in the field of family medicine. Dr. Dalwai has been plaintiff's family physician since the end of 2002. Past issues for which Dr. Dalwai has treated plaintiff included seizures, hip pain, left shoulder pain as well as neck pain.
46. The first time Dr. Dalwai actually treated plaintiff for problems with her right arm was on May 2, 2005. Plaintiff reported to her that she had been experiencing pain in her right arm for one month. This report is inconsistent with plaintiff's testimony at the hearing, where she stated her arm pain began sometime in February or March 2005. Dr. Dalwai determined plaintiff's main complaint on May 2, 2005 was in her shoulder but "[i]t was mostly like a neck pain."
47. Dr. Dalwai also saw plaintiff on July 28, 2005 after her non-work-related motor vehicle accident. Plaintiff reported pain in her low back and had trouble moving and bending as a result of her back pain. Prior to the motor vehicle accident, plaintiff had not reported any right elbow pain going down her wrist and into her fingers. This was a new complaint according to Dr. Dalwai. Dr. Dalwai also discussed a MRI of the neck and back that was performed and showed changes associated with arthritis and stenosis in the spine.
48. Dr. Dalwai formed an opinion that the pain plaintiff was experiencing in her right shoulder, elbow, and sometimes in her wrist was related to her neck. *Page 12 
49. When Dr. Dalwai issued work restrictions for plaintiff in July 2005, they were primarily for symptoms with plaintiff's back. The physical therapy prescribed was also for the back and is therefore not related to plaintiff's right arm claim.
50. Following review of the MRI of the neck and back, Dr. Dalwai diagnosed plaintiff with cervical stenosis and lumbospinal stenosis. At that time, Dr. Dalwai formed an impression that plaintiff's arm pain was related to problems originating from her back, specifically the arthritis in her neck. Dr. Dalwai further was of the opinion that plaintiff's left leg symptoms were related to the stenosis in her back causing radiation into the leg.
51. When Dr. Dalwai next saw plaintiff on October 6, 2005, her complaints predominantly involved back and left leg pain. Dr. Dalwai then referred plaintiff to a specialist for her back.
52. One change Dr. Dalwai noted with respect to the right arm symptoms between October 2005 and up to the time of her deposition in July 2006 was that plaintiff started reporting more right wrist pain and numbness as well as similar symptoms in her left hand.
53. Plaintiff treated at Wilson Immediate Care on May 23, 2006, where she was diagnosed with left wrist tendonitis and possible carpal tunnel syndrome. When she returned to Wilson Immediate Care on June 9, 2006, it was noted that her pain on the left was "pretty much symmetrical" to the pain on the right and that the symptoms on the left may actually "be a little worse than on the right."
54. When Dr. Dalwai saw plaintiff in mid-June 2006, she diagnosed her with bilateral carpal tunnel syndrome. At that time plaintiff had a positive Tinel's and Phalen's sign. Dr. Dalwai testified to her opinion that the current diagnosis for the elbow could be from the carpal tunnel syndrome or it could be epicondylitis. Dr. Dalwai stated that she had treated patients with *Page 13 
epicondylitis and carpal tunnel syndrome in the past. For carpal tunnel syndrome she would only be responsible for the initial treatment and diagnosis and then refer the patient to an orthopedic specialist for further treatment and assessment.
55. When asked if it was her opinion to a reasonable degree of medical certainty that plaintiff's carpal tunnel syndrome was related to her cashier position, Dr. Dalwai stated that "I don't think it [was] a specific work-related injury." She indicated that carpal tunnel syndrome is caused by pressure on the nerve, which in turn can be caused by swelling of the wrist, and can "happen to anybody" for all sorts of reasons. While she testified that a repetitive motion job "can" cause carpal tunnel syndrome, she also stated that the pain in plaintiff's neck and the stenosis can cause pain in the entire arm and could be the cause of her problems.
56. Dr. Dalwai stressed that she did not believe plaintiff's work as a cashier began her problem. At the most, "it maybe aggravated it." However, for questions of causation of carpal tunnel syndrome and epicondylitis, Dr. Dalwai stated she would defer to an orthopedist.
57. Dr. Dalwai had asked plaintiff to come back to her clinic in July 2006, but plaintiff never made the appointment.
58. Dr. David Dalsimer, an orthopedist, examined plaintiff on June 28, 2006. Dr. Dalsimer's records note that plaintiff gave a history of developing right wrist and forearm pain when lifting a loaf of bread in December 2004. She also claimed that she had been unable to use her arms since December 2004, a statement which is not corroborated by the hearing testimony and medical evidence. Plaintiff discussed with Dr. Dalsimer that she thought her symptoms were work-related.
59. Dr. Dalsimer noted that she presented with bilateral numbness and tingling in her hands and pain and stiffness in all of her digits. Dr. Dalsimer formed an impression of irritation *Page 14 
of the median nerve bilaterally, flexor tendonitis bilaterally in the forearm, and congenital ulnar positive deformity bilaterally. Dr. Dalsimer concluded that her symptoms appeared to be more consistent with nerve irritation than tendon irritation. He recommended a stretch and strengthening exercise program.
60. Dr. Dalsimer further stated that he did not feel plaintiff's bilateral symptoms were related to any injury or work activity. He released her to return to work and stated that she was capable of working without restrictions. He further recommended an EMG evaluation of both arms to determine if she had specific nerve compression or a generalized peripheral neuropathy. He planned to send her for a blood workup to rule out underlying causes such as rheumatoid arthritis, gouty arthritis, or other musculoskeletal problems.
61. The Full Commission adopts as fact Dr. Dalsimer's opinion in his June 28, 2006 report that plaintiff's problems in both of her hands and arms are not work-related. This opinion is supported by the fact that plaintiff's right arm pain did not improve after she no longer worked as a frontline cashier and plaintiff actually started developing similar symptoms in her left hand and arm beginning in the spring of 2006 while working within her light-duty restrictions.
62. No medical provider has linked plaintiff's bilateral carpal tunnel syndrome to her work as a frontline cashier in 2005.
63. In addition, no medical provider has ever written plaintiff out of work due to problems with her right hand, arm, or shoulder. As such, plaintiff lost no time from work as a result of her problems with the right upper extremity.
64. The Full Commission finds that plaintiff's work as a frontline cashier did not involve repetitive heavy lifting. *Page 15 
65. The Commission further finds that no competent evidence has been presented by plaintiff to establish to a reasonable degree of medical certainty that her right hand, arm and shoulder problems were caused by her work as a frontline cashier.
66. The greater weight of the evidence establishes that plaintiff problems with her right hand, arm, and shoulder are instead due to her non-work-related bilateral carpal tunnel syndrome, problems with her neck, or due to a combination of the two.
67. Plaintiff has further failed to establish by the greater weight of the evidence that her employment as a cashier placed her at an increased risk for the development of musculoskeletal or cumulative trauma disorder in the right hand, arm, and shoulder.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The underlying purpose of the Workers' Compensation Act "is to provide compensation for workers who suffer disability by accident arising out of and in the scope of their employment." Henry v. A.C.Lawrence Leather Co., 234 N.C. 126, 127-28, 66 S.E. 2d 693, 694 (1951). The evidence in the case sub judice establishes that plaintiff did not sustain an injury by accident as defined by the Workers' Compensation Act, and in filing her Form 18 and request for hearing plaintiff proceeded under an occupational disease theory.
2. In order for plaintiff to establish that she developed an occupational disease in her right hand, arm, and shoulder, she had to satisfy three conditions: (1) the disease must be characteristic of persons engaged in a particular trade or occupation in which the plaintiff is engaged; (2) the disease must not be an ordinary disease of life to which the public is equally *Page 16 
exposed; and (3) there must be a causal connection between the disease and the plaintiff's employment. Jarvis v. Food Lion, Inc.,134 N.C. App. 363, 517 S.E.2d 388 (1999); N.C. Gen. Stat. § 97-53(13) (2003). Plaintiff bears the burden of proving each and every element of her claim under N.C. Gen. Stat. § 97-53(13). Moore v. J.P. Stevens Co., 47 N.C. App. 744, 269 S.E.2d 159 (1980). The first and second elements of N.C. Gen. Stat. § 97-53 (13) are satisfied if the employment exposed the worker to an increased risk of contracting the disease than the public generally. "The greater risk in such cases provides the nexus between the disease and the employment which makes them an appropriate subject for work[ers'] compensation." Rutledge v. Tultex Corp.,308 N.C. 85, 301 S.E.2d 359 (1983) (quoting Booker v. Duke Medical Ctr.,297 N.C. 458, 256 S.E.2d 189, 200 (1979)). In this case, plaintiff failed to present competent expert testimony to establish that her problems with her right hand, arm, and shoulder were caused by her work as a frontline cashier.
3. In order to show a causal connection between the disease and her employment, plaintiff must show that her job was a significant causal factor or that her job significantly contributed to the development of her occupational disease. Jarrett v. McCreary Modern, Inc.,167 N.C. App. 234, 605 S.E.2d 197 (2004). The greater weight of the evidence shows that plaintiff's symptoms are not due to or contributed to by her employment with defendant. Plaintiff's symptoms are due to non-work-related problems, such as her bilateral carpal tunnel syndrome and neck issues.
4. Plaintiff failed to establish that she developed an occupational disease in her right hand, arm, or shoulder due to causes and conditions characteristic of and peculiar to her employment and which was not an ordinary disease of life to which the general public was equally exposed. N.C. Gen. Stat. § 97-53 (13); Booker v. Duke MedicalCenter, 297 N.C. 458 *Page 17 
(1979). The evidence failed to establish that plaintiff's work as a cashier placed her at an increased risk for the development of musculoskeletal or cumulative trauma disorder in the right hand, arm, and shoulder. Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359
(1983).
5. Plaintiff failed to meet her burden of proof on the issues of causation and increased risk, two essential elements for an occupational disease claim; therefore, plaintiff has failed to show that she developed an occupational disease in her right hand, arm, and shoulder as defined under N.C. Gen. Stat. § 91-53(13).
6. Accordingly, plaintiff has not been disabled due to her employment with defendant and is not entitled to workers' compensation benefits. N.C. Gen. Stat. § 97-2.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits is hereby DENIED.
2. Defendants shall pay the costs.
This the 29th day of June 2007.
 S/______________________
 BUCK LATTIMORE
 CHAIRMAN
CONCURRING:
 S/______________________ PAMELA T. YOUNG *Page 18 
COMMISSIONER
 S/______________________ DIANNE C. SELLERS COMMISSIONER.